## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL WILLIAMS-ISRAEL, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>IRIS ENERGY LIMITED, DANIEL ROBERTS, WILLIAM ROBERTS, and BELINDA NUCIFORA<br><br>    Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Paul Williams-Israel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Iris Energy Limited ("IREN", "Iris Energy", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded IREN securities between June 20, 2023 and July 11, 2024, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants'

violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased IREN securities during the Class Period and was economically damaged thereby.

7.      As of August 28, 2024, IREN stated that it was a "leading next-generation data center business powering the future of Bitcoin, AI and beyond[.]"

2

8.      Pertinent to this action, IREN previously described itself at times as simply a "leading sustainable Bitcoin miner" and then "a leading owner and operator of institutional-grade, highly efficient Bitcoin mining data centers."

9.      Defendant IREN is incorporated in Australia and its principal executive offices are located at Level 12, 44 Market Street, Sydney, NSW 2000 Australia.

10.      This complaint focuses in large part on IREN's claims about its high-performance computing ("HPC") capabilities, which relate to IREN's claims about its prospects in the data center business. According to IBM, HPC is "a technology that uses clusters of powerful processors that work in parallel to process massive, multidimensional data sets and solve complex problems at extremely high speeds. HPC solves some of today's most complex computing problems in real-time. HPC systems typically run at speeds more than one million times faster than the fastest commodity desktop, laptop or server systems." [1]

11.      Further, this complaint in part focuses on the Company's claims regarding air cooling vs. immersion cooling (otherwise known as liquid based cooling), in order to prevent a data center from overheating. Air cooling uses air conditioning, fans, and vents to circulate air in a data center and remove heat from computing equipment. Immersion cooling can be done by, for example, submerging IT components, such as servers, in a non-conductive fluid. The fluid absorbs and dissipates heat, preventing the IT components from overheating.

12.      IREN common stock trades on NASDAQ under the ticker symbol "IREN."

13.      Defendant Daniel Roberts is IREN's Co-Founder and has served as Co-CEO of IREN since its founding in 2018.

---

[1] See Stephanie Susnjara, Ian Smalley, IBM, July 9, 2024, https://www.ibm.com/topics/hpc

3

14.    Defendant William Roberts is IREN's Co-Founder and has served as Co-CEO of IREN since its inception in 2018.

15.    Defendant Belinda Nucifora ("Nucifora") has served as IREN's Chief Financial Officer ("CFO") since May 16, 2022.

16.    Defendants Daniel Roberts, William Roberts, and Nucifora are collectively referred to herein as the "Individual Defendants."

17.    Each of the Individual Defendants:

    (a)    directly participated in the management of the Company;

    (b)    was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)    was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (g)    approved or ratified these statements in violation of the federal securities laws.

18.     IREN is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

19.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to IREN under *respondeat superior* and agency principles.

20.     Defendant IREN and the Individual Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading**
**Statements Issued During the Class Period**

21.     On June 20, 2023, IREN issued a press release entitled "Iris Energy Announces 9.1 EH/s Expansion Plan and Revitalization of HPC Strategy". In this press release, IREN stated the following:

> ***Iris Energy is pleased to announce the construction of the remaining 80MW of data centers for Phase 1 (first 100MW) at its 600MW Childress site is underway***. The additional 4 x 20MW data centers are expected to increase the Company's potential operating capacity by ~63% (from 5.6 EH/s to 9.1 EH/s) and is targeted for completion by early 2024.

> ***Additional long-lead items also continue to be procured, including for Childress Phase 2 (second 100MW) which is expected to unlock ~13.6 EH/s of data center capacity***.

> Near-term focus remains on data center construction, whilst retaining flexibility on timing for miner purchases, which is subject to funding and market conditions. The Company remains well capitalized with ~64m of cash, no debt, operating cashflows from its existing 5.6 EH/s, as well as additional optionality from its committed equity facility.

> The Company also advises that its previous HPC data center strategy is now a parallel focus. Significant time was invested in exploring the strategy ~3-4 years ago, including signing a strategic memorandum of understanding with Dell Technologies in March 2020 to test and develop potential data center solutions for energy intensive compute applications, including leveraging Dell Technologies' HPC and artificial intelligence expertise. Developments continue to accelerate in the sector, including the growth of computing power and clean energy requirements. ***Recent discussions with market participants have further validated this previous work and that the time may be right to expand into this sector, utilizing Iris Energy's four existing operating sites and/or its***

*geographically diversified portfolio of additional global sites currently under development*. The Company's approach to 100% renewable energy has been a key focus for many prospective HPC counterparties.

(Emphasis added and internal citations omitted).

22.     The statement in ¶ 21 was materially false and misleading at the time it was made because it overstated the Company's prospects in HPC, considering that its Childress site is ill-equipped for to be used for data centers and HPC.

23.     On September 13, 2023, IREN filed with the SEC its Annual Report on Form 20-F for the fiscal year ended June 30, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Daniel Roberts, William Roberts, and Nucifora attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

24.     The 2023 Annual Report contained the following statement regarding one of the Company's purported strengths:

We are building proprietary data centers that continue to be refined through research and development efforts to further optimize the operational environment and efficiencies, including targeting stable performance during high and low temperature periods, as well as the life of our hardware.

*We believe our purpose-built proprietary data centers may provide operational advantages compared to less efficient airflow, cooling and re-heating designs* that may be limited in certain modified shipping container or retrofitted warehouses designs.

(Emphasis added).

25.     The statement in ¶ 24 was materially false and misleading at the time it was made because the Company knew or should have known that its Childress County, Texas site would be inadequate for use in the data center business, and that the Company's proprietary design was unlikely to work at the Childress site.

26.     The 2023 Annual Report contained the following risk disclosure:

***Our increased focus on potential HPC solutions may not be successful and may result in adverse consequences to our business, results of operations and financial condition.***

Our growth strategy includes exploring the potential diversification of our revenue sources into new markets. In particular, we have revitalized our strategy of exploring the potential use of our existing and future infrastructure to develop and offer HPC solutions to a broad range of industries and applications, which may include scientific research, engineering, rendering and AI/ML. We believe our future success will depend in part on our ability to execute on our growth strategy and expand into new markets.

***We have limited experience in developing and offering HPC solutions, or acquiring the relevant components to develop an offering of HPC solutions***. ***We may experience difficulties with infrastructure development or modification, engineering, product design, product development, marketing or certification, which could result in excessive research and development expenses and capital expenditure, delays or prevent us from developing and offering HPC solutions at all***. Our focus on developing and offering HPC solutions may also disrupt our business, divert our resources, and require significant management attention that would otherwise be available for utilization within and development of our existing business. Additionally, our ability to develop and offer HPC solutions relies on third-party components, including GPUs for which there are limited suppliers, which require significant capital expenditure and may be difficult to procure given the current elevated demand. We may be unable to raise the required capital as a result of the risks described under "—We may be unable to raise additional capital to fulfill our capital or liquidity needs and/or grow our business and achieve our expansion plans."

In addition, as we continue to enter into new markets such as HPC, we will face new sources of competition, new business models and new customer relationships. In order to be successful, we will need to cultivate new industry relationships and strengthen existing relationships to bring any new solutions and offerings to market, ***and the success of any HPC solutions we develop will depend on many factors, including demand for HPC, our ability to win and maintain customers, and the cost, performance and perceived value of any HPC solutions we develop***. As a result, there can be no assurance that any HPC solutions we develop will be adopted by the market, or be profitable or viable. Our limited experience with respect to HPC solutions could limit our ability to successfully execute on this growth strategy or adapt to market changes. If we are unsuccessful in developing and offering HPC solutions, our business, results of operations and financial condition could be adversely affected.

***The market for HPC solutions is driven in large part by demand for server clusters, specialized or high-performance applications, and hosted software solutions which require fast and efficient data processing, and is characterized by rapid advances in technologies. It is difficult to predict the development of demand for HPC solutions, the size and growth rate for this market, the entry of competitive products, or the success of***

*any existing or future products that may compete with any HPC solutions we may develop*. If there a reduction in demand for any HPC solutions, whether caused by a lack of customer acceptance, a slowdown in demand for computational power, an overabundance of unused computational power, technological challenges, competing technologies and solutions, decreases in corporate spending, weakening economic conditions or otherwise, it could result in reduced customer orders, early order cancellations, the loss of customers, or decreased sales, any of which would adversely affect our business, results of operations and financial condition.

Our investments in further developing and offering HPC solutions in addition to our existing business of Bitcoin mining may result in new or enhanced governmental or regulatory scrutiny, litigation, confidentiality or security risks, ethical concerns, or other complications that could adversely affect our business, reputation, results of operations or financial condition. The increasing focus on the risks and strategic importance of certain HPC applications, such as AI/ML technologies, has already resulted in regulatory restrictions that target products and services capable of enabling or facilitating AI/ML, and may in the future result in additional restrictions impacting any offerings we may develop, including HPC solutions. Complying with multiple regulations from different jurisdictions related to new solutions that we develop could increase our cost of doing business or may change the way that we operate in certain jurisdictions. Furthermore, concerns regarding third-party use of AI/ML for purposes contrary to governmental and societal interests, including concerns relating to the misuse of AI/ML applications, models, and solutions, could result in restrictions on AI/ML products which in turn reduce the demand for HPC solutions and negatively impact our business and financial results. It is also unclear how our status as an infrastructure provider for customers developing and deploying AI/ML applications as opposed to developing such applications ourselves will affect the applicability of these regulations on any offerings.

(Emphasis added).

27.    The statement in ¶ 26 was materially false and misleading at the time that it was made because it omitted that the Company's HPC pivot was unlikely to be a success because the Company's Childress site is ill-equipped for use as a data centers (or HPC), as distinct from cryptocurrency mining.

28.    The 2023 Annual Report contained the following risk disclosure:

*Our business, operating plans and expansion plans may be delayed or change in light of evolving market conditions and several other factors.*

*Our business plan is predicated on multiple assumptions, including our ability to procure additional hardware for Bitcoin mining and for HPC solutions that we aim to develop, in each case with certain performance specifications at certain future dates*

*and prices, and the acquisition, development and construction of additional locations and infrastructure to host such hardware*. Our business plan is subject to change due to various factors, including market conditions, our ability to raise additional capital, the ability to procure equipment in a quantity, at a cost, to a certain quality, to certain specifications and on a timeline that is consistent with our business plan, and the ability to identify and acquire additional locations for new data center and electrical infrastructure sites to replicate the existing operating model at our operational facilities or build facilities adopting new operating models consistent with our business plan.

For example, in June 2022, we announced that, having regard to current market conditions and available financing terms, we intend to defer additional major capital expenditure for work beyond our initial 4.3 EH/s of hashrate capacity to preserve balance sheet flexibility until market uncertainty subsides and financing terms improve. In light of evolving market conditions, we have subsequently expanded our current hashrate capacity to 5.6 EH/s (as of August 31, 2023) *and in June 2023, announced the plan for the potential construction of an additional 80MW of data centers at our Childress site*, targeting potential expansion of aggregate hashrate capacity across all our operating sites from 5.6 EH/s to approximately 9.1 EH/s of potential hashrate capacity (assuming the purchase of Bitmain S19XP miners and full utilization of such additional data center capacity). *Our near-term focus remains on data center construction, which is subject to funding and market conditions. Miners have not yet been purchased in respect of the Childress expansion beyond the currently operational 20MW or for any other expansion of operating capacity at our sites, and we continue to monitor the market for funding and purchase opportunities. In June 2023, we also announced the revitalization of our prior HPC strategy*.

We will continue to review expansion plans in light of evolving market conditions. Any such delays, inability to raise capital and any failure to execute on growth strategies, could adversely impact our business, capacity, financial condition, cash flows and results of operations.

(Emphasis added).

29.    The statement in ¶ 28 was materially false and misleading at the time that it was made because it omitted that the Company's Childress site is ill-equipped for to be used for running data centers (and HPC generally).

30.    The 2023 Annual Report contained the following risk disclosure about electricity access:

*Any electricity outage, non-supply or limitation of electricity supply or increase in electricity costs could materially impact our operations and financial performance.*

Our primary input is electricity. We rely on third parties, including utility providers, for the reliable and sufficient supply of electricity to our infrastructure. *We cannot guarantee that these third parties will be able to provide any electrical power including at sufficient levels and consistently, or will have the necessary infrastructure to deliver any power that we may require, or that we will be able to procure power from or recontract with them on commercially acceptable terms*. Non-supply or restrictions on the supply of, or our failure to procure, sufficient electricity could adversely affect our operating performance and revenue by constraining the number of ASICs or other hardware (including hardware for any HPC solutions we may offer) that we can operate at any one time. This may adversely impact customers for any hosting or HPC solutions we may offer, for example by adversely impacting our ability to meet contractual requirements in respect of uptime, availability or performance.

Our access to electricity, or sufficient electricity, may be affected by climate change, severe weather, acts of God, natural and man-made disasters, political or market operator interventions, utility equipment failure or scheduled and unscheduled maintenance that results in electricity outages to the utility's or the broader electrical network's facilities. These electricity outages may occur with little or no warning and be of unpredictable duration. Further, our counterparties may be unable to deliver the required amount of power for various technical, economic or political reasons. As Bitcoin mining and operation of data centers generally (including, for example, to provide HPC solutions) are energy intensive and backup power generation may be expensive to procure, any backup electricity supplies may not be available or may not be available on commercially acceptable terms, or be sufficient to power some or all of our hardware in an affected location for the duration of the outage. Any such events, including any significant nonperformance by counterparties, could have a material adverse impact on our business, financial performance, financial condition and results of operations.

*       *       *

In addition, in Texas, the electricity market is deregulated and operates through a competitive wholesale market. Electricity prices in Texas are subject to many factors, such as, for example, fluctuations in commodity prices including the price of fossil fuels and other energy sources. The market for oil, gas and other fossil fuel energy sources was volatile during calendar year 2022, and we can provide no assurances that such price disruptions in such deregulated markets will not result in material increases in the price for electricity in such markets in the future. Similarly, high temperatures experienced in Texas during the Summers of 2022 and 2023 were partially responsible for historically high electrical demand from the Electricity Reliability Council of Texas ("ERCOT"), the organization that operates Texas' electrical grid, which was reflected in higher than usual wholesale electricity prices during this period. High wholesale electricity prices directly impact the price we pay for electricity. As part of our electricity procurement strategies in Texas, we may participate in demand response programs, load curtailment in response to prices, or other programs, including the use of automated systems to reduce our power consumption in response to market signals. Such automated systems may activate incorrectly or fail from time to time, or our manual operations may not be able to respond

as intended, and there is no guarantee that our participation in demand response programs, load curtailment in response to prices, or other programs, will result in electricity price reductions or additional revenue. In addition, a recent bill passed by the Texas Senate would essentially provide that Bitcoin miners can only account for less than 10% of demand response at any given time. Although the bill was not voted on by the House, it can be reintroduced at some later time. Some demand response programs have regulatory compliance obligations that, if not adhered to or met, may result in fines or penalties. While we aim to mitigate price disruptions (for example, we may seek to purchase electricity market derivatives or hedges to minimize wholesale price volatility), there is no guarantee that such arrangements will be successful in mitigating volatility or increases in wholesale market prices. Increases and fluctuations in the cost of electricity we purchase could have a material adverse effect on our business, financial performance, financial condition and results of operations.

(Emphasis added).

31.     The statement in ¶ 30 was materially false and misleading at the time that it was made because it omitted that the Company's Childress site is ill-equipped for data centers and HPC. This is in large part because there is a single power transmission line at the Childress site, meaning that the Childress site does not have backup power.

32.     The 2023 Annual Report contained the following risk disclosure:

*Any long-term outage or limitation of the internet connection at our sites could materially impact our operations and financial performance.*
Our ability to validate and verify Bitcoin transactions, secure transaction blocks and add those to the Bitcoin blockchain, either directly or through a mining pool, is dependent on our ability to connect to the Bitcoin network or mining pools through the internet. *Similarly, our ability to offer other products or services using our data center capacity (such as hosting or HPC solutions we may offer) is also dependent on our ability to connect to the internet. Any extended downtime, limitations in bandwidth or other constraints may affect our ability to contribute some or all of our computing power to the network or mining pools.* We may not have backup internet connections at our operations, and any backup internet connections may not be sufficient to support all of our, or our customers, Bitcoin mining and HPC solutions equipment in an affected location for the duration of the outage, limitations or constraints to the primary internet connection. Any such events could have a material adverse impact on our operating results and financial condition.

(Emphasis added).

33.     The statement in ¶ 32 was materially false and misleading at the time that it was

made because it omitted that the Company's Childress site is ill-equipped for data centers and HPC, as distinct from cryptocurrency mining. This is in large part because there is a single power transmission line at the Childress site, meaning that the Childress site does not have backup power, thus increasing the risk of a long-term outage.

34.     The 2023 Annual Report contained the following risk disclosure:

***It may take significant time and expenditure to grow our Bitcoin mining operations and develop potential HPC solutions through continued development at our existing and planned sites, and our efforts may not be successful.***

The continued development of our existing and planned facilities is subject to various factors beyond our control. In the context of the COVID-19 pandemic (or any future pandemics), there is an elevated risk that the delivery or installation of equipment from suppliers will be delayed, and of shortages in materials or labor due to travel restrictions and social distancing requirements. There is also the risk of a COVID-19 outbreak on site, which would halt construction and operations in the short term.

***More generally, there may be difficulties in integrating new equipment into existing infrastructure***, constraints on our ability to connect to or procure the expected electricity supply capacity at our facilities, defects in design, construction or installed equipment, diversion of management resources, insufficient funding or other resource constraints. Actual costs for development may exceed our planned budget. In particular, our business strategy includes exploring the potential diversification of our revenue sources into new markets (such as HPC solutions), as well as the development of other new products and services leveraging our data center capacity and access to power. ***Our ability to execute on our HPC solutions strategy could be challenging in our current data center designs and may require retrofits, alterations or other custom designed solutions to enable the operating environment to function for potential HPC solutions***, which may be cost prohibitive, if the operating environment or site is capable of doing so at all. For example, this may necessitate close collaboration with cooling experts, engineers and specialized vendors to ensure thermal management is aligned with specific hardware requirements.

We intend to expand by acquiring and developing additional sites, taking into account a number of important characteristics such as availability of renewable energy, electrical infrastructure and related costs, geographic location and the local regulatory environment. We may have difficulty finding sites that satisfy our requirements at a commercially viable price or our timing requirements. Furthermore, there may be significant competition for suitable data center sites, and government regulators, including local permitting officials, may restrict our ability to set up data center operations in certain locations.

*        *        *

*Development and construction delays, cost overruns, changes in market circumstances, environmental or community constraints, an inability to find suitable data center locations as part of our expansion and other factors may adversely affect our operations, expansion plans, financial position and financial performance*. We will continue to review our expansion plans in light of evolving market conditions.  Any such delays, and any failure to increase our total data center or hashrate capacity in the future, could adversely impact our business, financial condition, cash flows and results of operations.

(Emphasis added).

35.     The statement in ¶ 34 was materially false and misleading at the time it was made because it omitted that while the Childress site may be suitable for cryptocurrency mining operations, it is not suitable as a location for a data center.

36.     The 2023 Annual Report contained the following risk disclosure:

*We may fail to anticipate or adapt to technology innovations in a timely manner, or at all.*

The digital asset, data *center and HPC solutions markets are experiencing rapid technological changes. Failure to anticipate technology innovations or adapt to such innovations in a timely manner, or at all, may result in our current and future capabilities becoming obsolete*. The process of developing and marketing new products, services, solutions or capabilities is inherently complex and involves significant uncertainties. There are a number of risks, including the following:

- *our product or service planning efforts may fail in resulting in the development or commercialization of new technologies or ideas*;
- our *research and development efforts may fail to translate new product plans into commercially feasible solutions*;
- our new products or solutions *(including HPC solutions we may offer) may not be well received by consumers or otherwise may fail to achieve their intended purpose or functionality*;
- we may no have adequate funding and resources necessary for continual investments in product planning and research and development; and
- our products or solutions may become obsolete due to rapid advancements in technology and changes in consumer preferences.

Any failure to anticipate the next generation technology roadmap or changes in customer preferences or to timely develop new or enhanced products in response could result in decreased revenue and market share.

(Emphasis added).

37.     The statement in ¶ 36 was materially false and misleading at the time it was made because it omitted that, because of material deficiencies in the Childress site, as it related to its future use for HPC, the Company is unlikely to achieve success with its business plans at that site.

38.     On September 13, 2023, IREN hosted its Fiscal Year 2023 Results Conference Call. On this call, Daniel Roberts made the following statement about liquid cooling in response to an analyst question:

> **Analyst Question**: Thanks, Dan. ***And then a follow-up around uptime and power efficiency and utilization***, we've seen in prior presentations at prior results and the slide that you provided during this presentation that your utilization and efficiency in power use relative to peers based on those charts has been best-in-class in many cases. And I wanted to ask what you attribute that mostly to? Is it a distinct data center engineering profile? Is it algorithmic in terms of your systems? How should we think about your edge versus the rest of the sector in terms of the capacity at your disposal?

> **Daniel Roberts**: We build data centers, but I know that's a very single statement, but I'm not sure others do. But most of those on that slide are still putting computers in C Can's. I feel like the sector is maturing. ***Maybe we're sitting in the wrong concept, maybe we're a data center computing business and not a crypto miner as decided***. I mean there's a lot of wide gaps there that illustrate the inability or the fact that they haven't been utilized. I think operating thousands of computers in C Can's in a remote site, potentially a challenge. ***I think the whole immersion cooling we said it, we'll keep saying it. You cannot manage heat as effectively with immersion cooling in Texas. It is just the laws of physics***. It becomes exponentially hard when you're trying to evacuate heat kind of a fluid in 100-degree temperature.

(Emphasis added).

39.     The statement from Daniel Roberts in ¶ 38 was materially false and misleading because he understated the viability of immersion (or liquid) cooling in Texas. Specifically, Defendant Roberts' claim that immersion cooling would not effectively work in Texas due to the "laws of physics" was unsupported by fact.

40.     On the same call, Defendant Daniel Roberts made the following statements about

14

data centers at the Childress facility, in response to questions from an analyst:

> **Analyst:** Hi, good morning guys. Dan and team, congrats on the tremendous growth in operations over the past year here. First for me, it would be great to get some more detail on the expansion build-out and energization of the miners at Childress. I know your guidance calls for about 3.5 exahash as of miners to come online in early 2024. So I was wondering, should we expect that to come online all at once? And when you say early 2024, are we looking sometime in 1Q?

> **Daniel Roberts:** I can take this Lincoln, good to hear from you and see you, Mike. Look, as we've previously advised, the expansion of this site happens in 20-megawatt data center increments. Each 20 megawatts is approximately 800 petahash to 850 petahash depending on the specific Milo model that we installed there, kind of revolving around that low-20s efficiency, so basically, as and when each data center is commissioned, that facilitates the ability to plug in around that 800 petahash to 850 petahash.

> In terms of minor procurement, -- we will advise the market once we formally enter into a purchase agreement for delivery. But at this stage, we remain where we were before, where we think there is substantial optionality in holding. There are a number of conversations ongoing around the right way to procure models in terms of the economics of it and the structure of it. We intend to fill those data centers swiftly as they're commissioned. But at this stage, the ability to tell you exactly how we're doing that. We prefer not to go into too much more detail.

> **Analyst**: Great. Well, fair enough, Dan. I appreciate that. And just looking beyond Phase 1 of this 100-megawatt build-out at Childress, in light of the upcoming having and thinking about future scale, scaling of that facility. How do you plan to approach future expansion? If you could just talk through some of the dynamics there and your thought process as we navigate into future expansion?

> **Daniel Roberts**: Absolutely. And I think this is what I was alluding to at the start of the call, the hard work has been done. We've got the platform. We've got the site. We've got the team. It's just a continual cookie cutter exercise, quite frankly, where we just have teams on site that roll from one building to the next rolling out 20 megawatts at a time. ***We don't need any more power. We don't need any more land. We don't need new supply chains, new ways of doing things. We've proven our data center design***. We've proven how it interfaces with the energy market.

> (Emphasis added).

41.     The statement in ¶ 40 was materially false and misleading at the time it was made because IREN's data center design was not "proven", as it related to engaging in the HPC business in Texas, given the differences in temperature between Texas and British Columbia.

42.     On May 15, 2024, the Company issued a press release entitled "IREN Reports Third Quarter FY24 Results." It stated the following:

Next-Generation Data Centers: 260 MW of operating centers, expanding to 510 MW in 2024. ***Specifically designed and purpose-built infrastructure for high-performance and power-dense computing applications***.

(Emphasis added).

43.     The statement in ¶ 42 was materially false and misleading at the time it was made because certain Company facilities, such as in Childress, Texas, were built for bitcoin mining and not HPC.

44.     On March 27, 2024, Defendant Daniel Roberts participated in an interview with Anthony Pompliano. This interview was published on YouTube under the title "Bitcoin Mining is Dominating Data Centers." This interview included the following exchange:

**Interviewer**: I thought a great place to start this conversation is you guys burst onto the scene you built these data centers where you're doing Bitcoin mining. Bitcoin is surging, everyone's really excited, but maybe you weren't actually just building a Bitcoin miner. What it seems like you guys were doing was really building data centers where you could put Bitcoin mining or you could put artificial intelligence computational power as well. And so maybe we just start with like, what is a data center, and how did these exactly work?

**Daniel Roberts**: Yeah look [that's right] clearly we didn't see the current wave of AI taking off as it did but when we built this business uh five and a half years ago it was all about the thesis that we needed power dense data centers. So, what is a data center?

Historically over the last couple of decades you've seen the emergence of these major capital city data centers, which are typically optimized for things like [live time] cloud computing, so mission critical: hospital, government, corporate cloud computing systems, ***and what we foreshadowed when we started IREN was that the emergence of just power dense compute, so just workloads that needed to crunch data***, now whether that was genomics, un whether that was just gas and oil reservoir analysis, whether it was machine learning, AI . . . Bitcoin at the time we were very bullish on bitcoin, we remain bullish on bitcoin. ***What a great way to bootstrap the development of these power dense data centers and the key difference between what we've built and traditional data centers is their ability to handle these power dense workloads and that goes to two main things.***

One is what they term rack density, so the amount of power that you can physically feed into a rack, which is you know a column of computers. ***And the other one is ventilation***

16

*and cooling, the ability to transfer the heat that is generated from that computing power away from the rack to keep the computers cool.*

(Emphasis added).

45.     The statement from Daniel Roberts in ¶ 44 was materially false and misleading because, upon information and belief, the Company did not start its business or begin using the Childress site with HPC applications in mind. Rather, the Company stated that it was pivoting to the data center business (despite material weaknesses in, for example, its Childress site for other uses besides bitcoin mining), due to weaknesses in its cryptocurrency mining business.

46.     The same interview included the following exchange:

**Interviewer**: How much of the business um in terms of uh building the infrastructure, the cost of capital, the decision between bitcoin and AI are directional bets on these two trends continuing versus if another trend popped up you could easily kind of switch to whatever, you know, what's kind of the opportunity- like how much is . . .*okay the company is going to succeed or fail based on whether Bitcoin and AI is you know bigger five hears from now?*

**Daniel Roberts**: Yeah it's kind of [both to be honest] like we first bought Bitcoin over 10 years ago, and that sounds impressive, but I bought on the run up to $1,000, it went to $500, and I thought "this is nonsense" and sold it all. Um, but over time you learn that this thing doesn't die. *There's only 21 million [Bitcoins], you can't stop it, how does this not create this positive flywheel effect, particularly with the halvings every four years where it goes up a lot in value?*

(Emphasis added).

47.     The statement in ¶ 46 was materially false and misleading because Daniel Roberts omitted that while the halving process could boost the value of Bitcoin, that it would be materially harmful to the Company because it would reduce the efficiency of the Company's bitcoin mining activities, because it would reduce the amount of Bitcoin awarded for the Company's mining efforts.

48.     The same interview included the following exchange about location of data centers and about power sources:

**Interviewer**: Now when you think of building these data centers and operating these data centers how much of it is like the classic real estate you know, location, location, location, even though people aren't necessarily coming by like retail foot traffic? *You do have to think a lot about, like, energy sources if you're not near the energy it's probably more expensive and so how do you think about energy sources, select those energy sources and think about locations to put these data centers?*

**Daniel Roberts:** *Absolutely, and look, most of our backgrounds is in infrastructure, renewable energy development,* as well as the data center side and what we saw firsthand was this western government push to promote the buildout of renewable energy. And like most government programs, there's side effects of how that works and one of those unintended consequences is building a lot of renewable generation in places where people cannot use it. So you think about the Blackstone's, the Blackrock's. . . all these people building and buying solar farms . . . it doesn't matter where they build them, they will still get the renewable energy certificate.

*So our Childress site, which is located up in the panhandle region of Texas . . there's around 32 gigawatts of wind and solar, the transmission line's 12 gigawatts to actually export that load down to Dallas and Houston and [the other demand centers]. So for us, the ability to go and locate in what is a quite sizable regional town in Childress, but take up this excess renewable energy and turn it into computing power whether that's AI, bitcoin, or future applications is something that's really compelling and attractive from a cost and value generation perspective*.

(Emphasis added).

49.     The statement in ¶ 48 was materially false and misleading because Daniel Roberts overstated the attractiveness of the Childress site for use in the data center business, as opposed to cryptocurrency mining. In large part, Childress is unsuitable for use as a data center because there is no backup power by way of multiple transmission lines.

50.     In the same interview, Defendant Roberts made the following statement:

*[W]e've built this base layer, this bedrock, of high performance data centers that can do any high performance compute*. At the end of the day, we're experts that manage that physical infrastructure, power density ventilation aspect as well as the technology layer on top of that to monetize it.

(Emphasis added).

51.     The statement in ¶ 50 was materially false and misleading because the Company overstated the capabilities of its data center business, and its overall prospects given that the

Company's Childress site is ill-suited for use in the data center business, as opposed to Bitcoin mining.

52.     On May 15, 2024, the Company conducted its Q3 2024 earnings call. The Q3 2024 earnings call included the following statement from Daniel Roberts:

> So I mentioned at the outset that Will and I, when we set this business up, we had a view that over the next 10 years to 20 years the world was going to have a very large growing, exponentially growing demand for compute and power from renewable energy sources to power that compute. So developing power and land is something that doesn't cost a lot of money but it costs a lot of time. It takes years identifying sites, securing the sites, putting in grid connection studies, building out grid connections. It's something that historically has taken three, four, five years and now with the onset of a tremendous amount of demand from Bitcoin miners, hyperscalers, data center providers, we are being told that these timelines are getting pushed out five, six, seven years. So what does this mean?

> The opportunity for us has always been to organically grow into this capacity, but we're now engaged in conversations with various stakeholders that continue to triangulate and validate that this data and power crunch is real. Morgan Stanley, Goldman Sachs have all released reports in the last month. ***In fact the Morgan Stanley report went into some detailed quantitative analysis around what the value of having power and land was and they came up with a number of $5 to $12 per watt. We've got 3 billion watts so that implies a tremendous amount of value in the portfolio***.

> Is it worth that? Is it worth something different? We have no idea but certainly this is the time in the market to start finding out. So we're undertaking a process to explore various structures, everything from prospective sales of some of our development sites to joint ventures over our development sites where we could build, own and operate some sort of shell, provide a co-location service, provide a cloud service. We're talking to a number of the technology companies, we're talking to a number of end investors, the large banks, and it's something that we're excited to pursue over the coming months.

> (Emphasis added).

53.     The statement in ¶ 52 was materially false and misleading at the time it was made because Morgan Stanley's findings were misrepresented.

54.     On June 5, 2024, Daniel Roberts participated in an interview with McNallie Money. A video of his interview was published on YouTube under the title "IREN CEO Interview | Top Bitcoin Mining Stocks Right Now | Bitcoin News Today | IREN". This

interview was also posted on IREN's website. It included the following exchange, in which the interviewer asked a question indicating that British Columbia is a more ideal environment for HPC than Texas:

> **Interviewer**: [again two final quick questions Dan and I'll pass over to Bryce ***but on HPC first one is um obviously based in British Columbia the weather conditions probably suit more] more suitable there [SIC] than Texas what's the sort of like uh up up time in terms of um service***?
>
> **Defendant Daniel Roberts**: Um if it's not 100% we ask ourselves why um like it's really simple ***like we can operate these things and we've proven we can operate up to 111 degrees Fahrenheit.*** I don't think we've got to hop out a temperature [SIC] to be able to say we can operate hot hotter because it hasn't been hotter um like it's very simple engineering around CFM and air flow in chip temperatures moving that air through the facility to keep the chips at an adequate operating temperature. ***So, um if they go down it's like well [why'd] it go down um you know even things like transformers like you know we under-spec them as in we over spec the capacity because it's like engineering 101*** is a bit like you take the rated capacity of anything and you operate at 80, 90% of that there's a massive efficiency game. You never really want to be pushing up towards 100% there's just the decline in um efficiency just becomes almost exponential, so always spend a little bit of extra capital, like it's marginal in the grand scheme of things, and give yourself that redundancy and we see that throughout the facilities. ***And yeah even we get things wrong, believe it or not, like you get things wrong every day, um and what we thought was a real ["over-specing"] of these transformers you go gee whiz that is actually a little bit closer so let's get this even better for the next data center we build.*** Let's over spec it even higher, and I think we've seen in this industry electrical issues from other companies, right, where they say we need one megabyte of capacity let's buy a one megawatt transformer and if you do that and you have that mindset of just matching one for one then you will come unstuck over time, we've seen that happen.

(Emphasis added).

55.    The statement in ¶ 54 was materially false and misleading at the time it was made because IREN's data center design was not "proven", as it related to engaging in the HPC business in Texas, given the differences in temperature between Texas and British Columbia.

56.    The statements contained in ¶¶ 21, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, and 52 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and

prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants overstated Iris Energy's prospects with data centers and high performance computing, in large part as a result of material deficiencies in Iris Energy's Childress County, Texas site; and (2) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

57.    On July 11, 2024, during market hours, Culper Research ("Culper") issued a report entitled "Iris Energy Ltd (IREN): A Prius at the Grand Prix" (the "Culper Report" or the "Report"). In the Report, Culper announced that it was "short [IREN], a bitcoin miner that now promotes itself as a [HPC] data center play." It then stated the following:

> IREN was founded in 2018 as a bitcoin miner, but now in 2024 claims its facilities have always been primed for HPC, touting for example that, "*from Day 1, we've built out our facilities*" as "*multi-decade high-performance data centers*" with "*no cutting corners.*"

> (Emphasis in original).

58.    Culper further stated that it was "short IREN because we believe the Company has dramatically misrepresented the strength and potential of its assets for HPC/AI applications."

59.    This narrative, Culper noted, "is entirely contrived: IREN's facilities were all constructed and commissioned prior to April 2023, but IREN's convenient HPC pivot kicked into high gear in June 2023 – *just three months after the launch of ChatGPT-4*." (Emphasis added). The Report then stated the following regarding Defendants Daniel and William Roberts selling their shares:

Our analysis further shows that IREN's flagship Childress buildout lacks numerous features that are critical to HPC applications. Co-CEO Daniel Roberts – who lives on the other side of the planet in Sydney, Australia – has promoted IREN shares incessantly on multiple paid interview platforms. ***However, behind the scenes, starting in February 2024, both Daniel and his Co-CEO and brother Will have started selling their own shares for the first time since the Company's IPO***. [. . .] ***We believe IREN is a painfully transparent stock promotion that will unravel as investors realize the Company's HPC claims are nonsense and IREN remains a cash guzzling machine***.

(Emphasis added).

60.     The Report further stated the following about IREN's purported lack of financial

commitment to its HPC plans:

IREN talks a big game of its HPC plans, but ultimately seems entirely disinterested in actually doing what it takes to compete in the space. Look no further than IREN's own financials: ***the Company has spent less than $1 million per MW to build out its existing footprint, and tells investors it will complete the Childress build for a similar sub-$1 million per MW figure. Meanwhile, leading operators, analysts, and experts all confirm that the trust cost to develop an HPC-ready data center is [$10] to $20 million per MW***. ***To analogize, IREN claims that it's set to win the Monaco Grand Prix, but just arrived to the track in a Toyota Prius***.

(Emphasis added).

61.     In the Report, Culper stated that its review of the Company's Childress, Texas

technical specifications revealed the following "deficiencies", stating as follows:

- IREN implies it can build Childress to "Tier 3" data center standards or better, which hold at least one, if not two power redundancies, usually in the form of batteries, then diesel generators. However, Childress – which is powered [by] a single transmission line – has zero apparent backup power or uninterruptible power supplies ("UPS"). IREN's now stuck; sources say lead times are now at least a year, while we estimate batteries and diesel generators would cost $1 billion or more if IREN were to ever build 600 MW in full.
- IREN claims to have "proven" that its air cooling will be sufficient for GPU clusters in Texas. ***This claim is incredibly misleading for two reasons. First, IREN has only ever tested GPUs in British Columbia, not Texas, where temperatures are 20 to 40 degrees hotter year-round. Second, our review of the specs on IREN's AI servers suggests that they can only operate up to 95 degrees***, as compared to 113 degrees for Antminer ASICs. As confirmed by the words of one industry consultant we spoke with, ["if [IREN claims] that they're doing air cooling in Texas, they're crazy."] IREN's clinging to air cooling also stands at odds with numerous HPC-ready data centers we reviewed, which

overwhelmingly employ liquid or other next-gen cooling systems in high-density racks. ***Finally, IREN's cooling solution will be left in the dust as NVIDIA's next-generation architecture requires liquid cooling***. (Emphasis added).

- IREN claims that Childress is an attractive asset because of its access to low-cost power, yet this ignores the fact that IREN's low-cost power has historically been a function of BTC mining curtailments and power sales back to the grid. In an HPC environment requiring 99.9% or greater uptimes, we believe IREN would need to form a new power purchase agreement ("PPA") at significantly higher costs.

- ***While best-in-class data centers position themselves in fiber and infrastructure-rich locales such as Northern Virginia, the Bay Area, or Austin, Childress is in a literal and figurative desert. FCC data shows Childress County holds just a single fiber line, an anomaly among other Texas sites*** such as those from Core Scientific (22 lines) and Elon Musk's Giga Factory (18 lines). (Emphasis added). In our view, the very fact that IREN decided to build in Childress *at all* disproves the notion that IREN had ever planned on building anything more than a crypto mining operation, let alone well-equipped "*long-term*" HPC data centers. (Emphasis in original).

62.     The Report stated the following about the Company's claims about the value of its land:

> The Company further claims its undeveloped land and power agreements are worth $5 to $12 million per MW, implying billions in latent value, even as the Company spent just $4.7 million for its 1,400 MW West Texas interconnection deposit in November 2023. ***Yet IREN bases this claim by blatantly misquoting a Morgan Stanley research note that referred to the value not of land and power, but of fully built infrastructure that could be readily converted to HPC applications, hence saving time vs. ground-up development***. Indeed, the very same Morgan Stanley note estimates ground-up development costs of $12 million per MW – again 12x what IREN is spending to develop what it claims are similar assets.

> (Emphasis added).

63.     The Report further stated that "IREN not only misrepresents its existing operations and its expansion at Childress, but the value of its undeveloped land and power. For Example, the Company implied on its May 15, 2024 conference call that it's worth tens of billions of dollars, based on a Morgan Stanley report[.]" It then referred to the following statement made by Defendant Daniel Roberts on the same call, as discussed in ¶ 52:

In fact, the Morgan Stanley report went into some detailed quantitative analysis around what the value of having power and land was, and they came up with a number of $5 to $12 per watt. We've got 3 billion watts. So that implies a tremendous amount of value in the portfolio.

64.     The Report stated, however, that "if investors actually read the referenced Morgan Stanley research note, they would find that the analyst referred to value not solely in 'power and land', but **in existing crypto sites that could be converted to HPC**[.]" (Emphasis in original). The Report then provided the following image from the Morgan Stanley Research report:



65.     The Report then stated the following about the Morgan Stanley analyst argument (and included the following image from Morgan Stanley's analysis):

The analysts' argument is based not primarily on the value of the power, but on the time savings that could result from converting existing BTC mining operations into HPC operations, rather than building HPC-ready data centers from the ground up (i.e., using undeveloped land and power). Indeed, if IREN ever wanted to actually develop HPC-ready data centers, the very same Morgan Stanley report estimates that it would cost $12 million per MW – again 12x to 15x what IREN is actually spending

> indicative crypto facility enterprise value, on a $/W basis, is a small fraction of the cost of a new data center — our 100 MW Hopper Data Center Model shows a total cost/W of $32/W including the GPUs and all other site equipment, or $12/W excluding the chips and servers. **Third,** our analysis of the value to a data center

In reality, IREN paid just a $4.7 million deposit for the 1,400 MW initial connection in late 2023; Roberts' implicit claims that the asset is worth billions less than a year later is total nonsense.

66.     The Report stated the following about how IREN shares have reportedly become overvalued, as compared to its peers, as a result of misrepresentations made by Defendants:

> - IREN trades at $7.6 million per MW, reflecting the errant view that the Company's MW are tied to HPC-ready data centers. By contrast, recent M&A such as CoreWeave's offer for Core Scientific (CORZ), RIOT's offer for Bitfarms (BITF), and CleanSpark's (CLSK) offer for GRIID (GRDI) were at valuations of $2.3M, $2.6M, and $2.8M per MW, respectively. ***If IREN were to trade at a similar multiple, shares would trade 55% lower.***
>
> - With respect to public peers, again IREN trades at $7.6 million per MW, or $4.5 million per forward MW vs. peers at an average $3.5 million per current MW, or $1.5 million per forward MW, ***again implying ~50% downside to IREN shares.***
>
> (Emphasis added).

67.     The Report provided the background information on the Company's bitcoin mining business, and how unsuccessful the Company has become in recent months as a result of bitcoin "halving" (a process by which the reward for mining bitcoin is cut in half every four years, which increases the overall scarcity of bitcoin)[2] :

> IREN holds four sites located in Canal Flats, BC (30 MW), Mackenzie, BC (80 MW), Prince George, BW (50 MW), and Childress, Texas (100 MW). IREN initially acquired its Childress connection agreement in January 2022, and the site was launched in April 2023 as a bitcoin mining facility holding 0.6 EH/s [(the "hash rate", or speed at which

---

[2] *See* Investopedia, Bitcoin Halving: What It Is and Why It Matters for Crypto Investors, available at https://www.investopedia.com/bitcoin-halving-4843769

cryptocurrency mining device operates)] and 20 MW of capacity. Notably, these facilities were all constructed prior to IREN's convenient mid-2023 pivot to AI.

This pivot came as IREN's actual business of bitcoin mining was imploding, and the Company stared down the barrel of the April 2024 halving. ***IREN's mining efficiency has been decimated; BTC mined per EH/s fell from 81.6 to 30.4 in the past year alone, and continues to worsen post-halving***[.]

(Emphasis added).

68.     The Report then displayed the following graph, showing how the Company's

hash rate for its bitcoin mining has steadily declined:





69.     Against the background of a lowering hash rate, the Report stated that Defendant

Daniel Roberts began to state that the Company's facilities were built with high-performance

computing in mind, including that the Company had "built this base layer, this bedrock of high-

performance data centers that can do any high-performance compute" and that IREN's facilities

had been "[s]pecifically designed and purpose-built infrastructure for high-performance and

power-dense computing applications."

70.     The Report then stated that Daniel Roberts' claims about the Company's facilities having been purportedly built for high-performance computing were "total nonsense." It then stated the following:

> IREN has always, and will continue to be – ***a non-player in the HPC space because its facilities were built for BTC mining and are ill-equipped for HPC workloads without billions in additional costs***. To illustrate, IREN's 2022 Form 20-F contained zero mentions of "HPC", but IREN's 2023 annual report mentioned "HPC" a remarkable 97 times.

(Emphasis added).

71.     The Report stated that despite IREN claims that its long-term infrastructure is "well equipped for HPC and AI applications," what it was actually building lacked many of the key features possessed by its competitors.

72.     The Report published the following graph which highlighted IREN's deficiencies compared to its competitors, stating that "while these competitors may present their specifications in slightly different manners or have different solutions to redundancies, the end result remains resoundingly clear: [IREN is not a serious player in the space].":

| Operator – Data Center | Power Redundancy | Connection Redundancy | Liquid Cooling | Rack Density |
|---|---|---|---|---|
| Applied (APLD) – Ellendale | ☑ | ☑ | ☑ | 120 kW |
| Core (CORZ) – Austin | ☑ | ☑ | ☑ | 100 kW |
| TeraWulf (WULF) – Lake Mariner | ☑ | ☑ | ☑ | N/A[4] |
| Flexential – Atlanta 1 & 2 | ☑ | ☑ | ☑ | 100 kW |
| Atnorth – Iceland and Sweden | ☑ | ☑ | ☑ | 100 kW |
| Sabey Data Centers – Austin | ☑ | ☑ | ☑ | 100 kW |
| AQ Compute – Oslo | ☑ | ☑ | ☑ | 120 kW |
| Verne Global – Iceland | ☑ | ☑ | ☑ | N/A[5] |
| Iris (IREN) – Childress | ☒ | ??[6] | ☒ | 70 kW |

73.     Furthermore, the Report pointed out that "IREN's claims that both its existing footprint and its Childress expansion are "HPC-ready" fly in the face of widespread industry estimates regarding how much it costs to build HPC-ready data centers."

74.     The Report noted that as of IREN's "most recent quarterly report, the Company held just $168.8 million in buildings, at cost, while reporting 220 MW of power at these facilities, [implying that IREN spent a mere $771,818 per MW] to develop its existing footprint[.] IREN then claims it is building Childress into an HPC-ready data center for a similar cost, with Phase 2 consisting of a 150 MW buildout costing a mere $110 million[.]"'

75.     The Report contested IREN's claims regarding its costs per MW, stating the following:

> In a June 2024 report, Morgan Stanley estimated the total cost to build a new HPC-ready data center at $12 million per MW, excluding the cost of GPUs[.] A June 2024 report from JP Morgan states, *"it normally takes 3 to 5 years to build an HPC-grade data center from scratch and can cost as much as $20M per MW."* Finally, a May 2024 Needham report compares the development costs of HPC data centers to those of bitcoin mining operations, stating, "*HPC data centers are running at $8-10m per MW in capex (not including GPUs). A bitcoin mining site typically runs at $300-800k per MW in capex (not including ASICs)."* Tellingly, IREN's costs fall squarely in the latter camp. (emphasis in original)

76.     The Report then discussed how the Childress facility had only a single transmission line, and zero backup power, stating the following:

> ***True HPC-ready data centers have at least one, unusually two, and as many as four backup power sources. Childress has zero. Unlike BTC mining, which can – and often by design – curtails power for minutes, hours, or even days, HPC demands near 100% uptime***. (Emphasis added). As it was put to us by one industry advisor, *"In order to have 99% uptime, you need certain levels of redundancy."* (Emphasis in original). Yet IREN appears to bury its proverbial head in the sand, refusing to spend the necessary money to develop backup power / uninterruptible power supplies ("UPS"). This is further problematic given that Childress appears to have access to just a single 345 kV transmission line[.]

77.     The Report then showed the following image, taken from Childress County Tax

Abatement documents, showing a single transmission line at the Childress site:



Source: *Childress County Tax Abatement documents*

78.     The Report discussed the commercial consequences of IREN's lack of backup

power for the Childress site, stating the following:

> In layman's terms, potential customers such as OpenAI like to know that, say there were
> a storm, that their facilities wouldn't simply go down. Unfortunately, IREN doesn't
> seem to care.

79.     The Report quoted a "former IREN executive" as stating that "*[t]hey don't have*

*redundancies… [Power] It's from one source. For some reason if something went down on the*

*main grid, that's it. They don't have a generator sitting beside there*." (Emphasis and alterations

in original).

80.     The Report stated the following regarding IREN's air cooling infrastructure at the Childress facility, under a heading that stated that "[Childress lacks liquid cooling]" and that "[IREN's air cooling plans are nonsensical]":

> In the same manner, IREN claims that it can keep Childress operating with "high uptimes" using its existing cooling systems, that to this point have only ever been used to cool BTC miners[.] We believe, however, that existing air cooling is not only insufficient for HPC applications, especially in the extreme temperatures of West Texas, but that over time, they will be rendered obsolete by next-generation NVIDIA architectures that *require* liquid cooling. IREN appears to be dancing around the issue, because to admit that its existing systems are insufficient would be to admit that the Company must again spend gobs of money to upgrade to new systems.

81.     The Report then noted that Defendant Daniel Roberts had "continuously held that IREN's existing air cooling is the proper solution for HPC applications and high rack densities, even while competitors overwhelmingly utilize liquid cooling", in reference to Daniel Roberts stating in February 2023 that "*Hydro cooling . . . that's not something that's as much of interest to us, and similarly immersion today, we're doing a bit of R&D, is not that of interest. Purely and simply because air cooling is really efficient if you get it right*." (emphasis and alterations in original).

82.     The Report then stated the following, in reference to Daniel Roberts stating that "[y]ou cannot manage heat as effectively with immersion cooling in Texas. It is just the laws of physics. It becomes exponentially hard when you're trying to evacuate heat kind of a fluid in 100-degree temperature" on a September 2023 conference call, as discussed in paragraph 38:

> Daniel Roberts even went so far as to say that "the laws of physics" make air cooling more effective than immersion cooling "in Texas." It's unclear to us what Roberts means by this, given that liquids like water and dialectric fluids have a higher specific heat capacity (i.e., how much heat is needed to make the material one degree warmer) and thermal conductivity (i.e., the material's ability to transfer heat) as compared to air. It's also unclear to us how, specifically, Roberts thinks the laws of physics change once one enters the State of Texas.

83.     Culper stated in the Report that it did not "believe air cooling alone will work well in IREN's Childress facility, and IREN misrepresents their ability to do so. For example, in a June 2024 McNallie Money interview, [Daniel Roberts stated] '[w]e've proven we can operate these things up to 110 degrees Fahrenheit. It hasn't been hotter. Even things like transformers, we over-spec the capacity.'" Upon information and belief, the Report was paraphrasing the quote from Daniel Roberts in ¶ 54.

84.     In response to Daniel Roberts' quote, as discussed in the prior paragraph, the Report stated the following:

> Yet Roberts' claim that IREN has "proven" HPC operations in Texas is a [total misrepresentation] for two reasons – British Columbia is not Texas, and AI/HPC servers are not ASICs.
>
> - First, IREN has never demonstrated that it can operate GPUs in Childress, only in Prince George, BC, where temperatures are consistently 20 to 40 degrees lower throughout the year. Put simply in the words of one industry consultant we spoke with, *"If they [IREN] say that [air cooling is sufficient] about HPC in Texas, they're crazy."* (alteration and emphasis in original)
>
> - Similarly, AI/HPC servers must maintain lower temperatures than ASICs to maintain performance. [. . .]

85.     The Report referenced a Microsoft executive, who had discussed whether air cooling alone would be sufficient in Texas. The Report quoted the unnamed Microsoft executive as stating the following:

> I would highly 100% disagree with that [that air cooling is sufficient]. That is not the case. If anything, you need more localized cooling, you don't need to just air cool it. I mean, we do have some data centers like out in Massachusetts, where we didn't have any liquid cooling there until we brought in the GPUs. But then those GPUs run exceptionally hot. And if you have them burn out, then you just threw away $41,000. You want to make sure that you've got localized direct to chip, that you want to use urethane foams, that you've got gels on there. We also do rear-door heat exchangers in addition to direct-to-chip. We've been working on Phase II and Phase III liquid cooling, too. So if anything, actually, no, we're making a lot more investments in liquid cooling. **But those Texas data centers, too, you can't just operate GPUs in there and not have liquid cooling. Those things get 110, 120 degrees of just ambient temperatures. And**

*that's especially when you get humidity out there, that will degrade the quality of those GPUs even more. So no, you have to use liquid cooling*.
(Emphasis added and alteration in original).

86.     The Report quoted various industry stakeholders as saying the following about

the benefits of liquid cooling:

| Company, Date | Comments on Cooling |
|---|---|
| Equinix June 12, 2024 | *"...Anything over 20 kVA, which is quite a lot of power, requires special cooling. That's where you start going from air cooled, you have to move over to liquid..."* |
| Super Micro June 4, 2024 | *"And so it's really the cutting-edge companies right now that are putting in liquid cooling, liquid-cooled racks into their data centers."* |
| Vertiv May 14, 2024 | *"We see today finally, the transition going to happen from air to liquid. For example, Black will come out, will be de facto liquid cooling only."* |
| Core Scientific June 12, 2024 | *"HPC hosting requires multiple ancillary items such as air conditioning and cooling for the liquid that's actually being used to cool those machines... everything will be liquid cooled..."* |

| Digital Realty August 2023[18] | *"...[at] 46 kilowatts a rack, you have to do things like liquid cooling or you have to look at things like rear door heat exchangers to handle the heat. You just can't blow cold air..."* |
| MSFT/CORZ June 2024[19] | *"We got 192 data centers we're doing that with. We're ripping up the floor. We're putting in liquid cooling. We're piping in more power. It definitely takes longer."* |

87.     The Report then stated that that the views (as discussed above) "are corroborated

by our informal survey of actual HPC data center providers, who again offer or even require

liquid cooling above certain rack densities", and provided the following image to illustrate:

| Operator | Cooling Selection |
|---|---|
| DataBank | Liquid cooling for 30 to 80 kW densities. |
| AQ Compute | Liquid cooling for 35 kW to 120 kW densities. |
| Kao Data | Liquid cooling up to 100 kW, air cooling up to 40 kW. |
| TierPoint | Liquid cooling up to 85 kW. |
| Iron Mountain | Liquid cooling at 30 kW to 50 kW. |

88.     The Report stated the following about the Childress facility being in a "literal and

figurative desert":

While best-in-class data centers are placed in high-value locales with rich infrastructure such as Northern Virginia and the Bay Area, ***IREN has plopped its flagship facility in both the literal and figurative desert of Texas***: Childress is located 206 miles from Oklahoma City and 221 miles from Dallas/Fort Worth. ***Proximity to major metro areas is important for a number of reasons, including access to fiber providers, reduced latency (especially important for real-time data processing applications), proximity to undersea internet cables***, and the ability to attract talented employees.

On the other hand, according to the FCC's Texas Broadband Development Map, there is only a single (1) provider of fiber services in Childress County, Texas. By contrast, Core Scientific's (CORZ) facility in Denton County has 22 different fiber providers available. Travis County, home of Tesla's Giga Factory, has 18 providers available. Childress's closest undersea cable – which runs from Freeport, TX to Pascagoula, MS – is 543 miles away[.] ***In our view, the very fact that IREN is building in Childress disproves the notion that the Company ever intended its facilities to be used for anything besides crypto mining***.

(Emphasis added).

89.     On this news, the price of IREN stock fell by $2.03 per share, or 15.3% (or 13.1% as compared to the prior closing price), to close at $11.20 per share on July 11, 2024.

90.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired IREN securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of IREN, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IREN securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

93.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

94.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of IREN;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused IREN to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of IREN securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

97.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- IREN shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, IREN filed periodic public reports;

- IREN regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- IREN' securities were liquid and traded with moderate to heavy volume during the Class Period; and

- IREN was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

98.     Based on the foregoing, the market for IREN securities promptly digested current information regarding IREN from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

<u>**COUNT I**</u>
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
<u>**Against All Defendants**</u>

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

102.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of IREN securities during the Class Period.

104.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of IREN were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of IREN, their control over, and/or receipt and/or modification of IREN' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning IREN, participated in the fraudulent scheme alleged herein.

105.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other IREN personnel to members of the investing public, including Plaintiff and the Class.

106.    As a result of the foregoing, the market price of IREN securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of IREN securities during the Class Period in purchasing IREN securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

107.    Had Plaintiff and the other members of the Class been aware that the market price of IREN securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased IREN securities at the artificially inflated prices that they did, or at all.

108.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

109.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of IREN securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

110.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

111.    During the Class Period, the Individual Defendants participated in the operation and management of IREN, and conducted and participated, directly and indirectly, in the conduct of IREN' business affairs. Because of their senior positions, they knew the adverse non-public information about IREN's business practices.

112.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to IREN' financial condition and results of operations, and to correct promptly any public statements issued by IREN which had become materially false or misleading.

113.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which IREN disseminated in the marketplace during the Class Period concerning IREN' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause IREN to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of IREN within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of IREN securities.

114.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IREN.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:          October 7, 2024

**THE ROSEN LAW FIRM, P.A.**
/s/ Phillip Kim
Laurence Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
philkim@rosenlegal.com

*Counsel for Plaintiff*